## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

OMAR THOMAS,
  *Plaintiff,*

  v.

JOHN ALDI, et al.
  *Defendants.*

No. 3:18-cv-1350 (VAB)

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Omar Thomas ("Plaintiff"), an inmate formerly incarcerated at Corrigan Radgowski Correctional Center ("Corrigan"), Northern Correctional Institution ("Northern"), and MacDougal Walker Correctional Institution ("MacDougal Walker") in the custody of the Connecticut Department of Correction ("DOC"), has sued Security Risk Group Coordinator John Aldi ("SRG Coordinator Aldi"), Captain Dougherty, Lieutenant Tammaro, Lieutenant Papoosha, Lieutenant Chevalier, Lieutenant Davis, Correctional Officer Barbuto, Correctional Officer Laughman, Correctional Officer Hall, Captain Walsh, and Population Management for civil rights violations under 42 U.S.C. § 1983. Am. Compl., ECF No. 17 (Jan. 25, 2019) ("Am. Compl."). Mr. Thomas has alleged Defendants were deliberately indifferent to his safety and used excessive force. *Id.* at 8–10.

On March 9, 2020, this Court issued an Initial Review Order which allowed the deliberate indifference/failure to protect claims against SRG Coordinator Aldi, Captain Dougherty, Lieutenant Tammaro, and Correctional Officers Laughman, Hall, and Barbuto, as well as the excessive force claim against Correctional Officer Laughman to go forward. *See* Initial Review Order at 1–2, ECF No. 27 (Mar. 9, 2020) ("IRO").

1

Defendants have moved for summary judgment on all remaining claims. Mot. for Summ.

J., ECF No. 54 (May 20, 2022) ("Mot.").

For the following reasons, Defendants' motion for summary judgment is **GRANTED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Mr. Thomas is a formerly incarcerated inmate who was confined in the custody of DOC.

Pl.'s Rule 56(a)(2) Statement of Facts ¶ 1, ECF No. 68-2 ("Pl.'s Statement of Facts"); Defs.'

Rule 56(a)(1) Statement ¶ 1, ECF No. 54-2 ("Defs.' Statement of Facts").

DOC designated Mr. Thomas as a member of the Security Risk Group, Bloods, in 2015.

Pl.'s Statement of Facts ¶ 2; Defs.' Statement of Facts ¶ 2. At all times relevant to this matter,

Mr. Thomas has disputed this designation and argued that he was not a member of the Bloods

gang. Pl.'s Statement of Facts ¶ 2; Defs.' Statement of Facts ¶ 2; Ex. 1 to Opp'n at 60:16–61:24,

220:1–221:10, ECF No. 68-3 ("Mr. Thomas Dep."). After DOC affiliated Mr. Thomas with the

Bloods gang, the DOC transferred Mr. Thomas to the Security Risk Program at Corrigan. Pl.'s

Statement of Facts ¶¶ 8–10; Defs.' Statement of Facts ¶¶ 8–10.

Once designated as a Security Risk Group member, an inmate is placed on Security Risk

Group "status," which requires participation in a process intended to help the inmate renounce

the gang affiliation and reintegrate into DOC's general population. Pl.'s Statement of Facts ¶¶ 5–

6; Defs.' Statement of Facts ¶¶ 5–6.

Corrigan's Security Risk Group consisted of two housing units, B-Pod and E-Pod, which

housed inmates with various gang affiliations at various stages of the Security Risk Group

program. Pl.'s Statement of Facts ¶ 13; Defs.' Statement of Facts ¶ 13. In October of 2017, Mr.

Thomas was in phase 3 of the Security Risk Group program and was placed in E-Pod. Pl.'s Statement of Facts ¶ 14; Defs.' Statement of Facts ¶ 14.

Mr. Thomas's allegations in the Amended Complaint relate to two distinct incidents.

### a. Mr. Thomas's Requests for Protective Custody and the January 20, 2018 Incident

In October of 2017, Mr. Thomas first informed Lieutenant Tammaro that Mr. Thomas had safety concerns due to threats by the Bloods members in his housing unit. Pl.'s Statement of Facts ¶ 15; Defs.' Statement of Facts ¶ 15; Mr. Thomas Dep. at 85:14–87:3. Mr. Thomas told Lieutenant Tammaro that he was being threatened because he was not a Bloods member and requested verbally and in writing that Lieutenant Tammaro place him in protective custody. Pl.'s Statement of Facts ¶ 15; Defs.' Statement of Facts ¶ 15; Mr. Thomas's Dep. at 86:19–91:25. Mr. Thomas requested protective custody from Lieutenant Tammaro, Captain Dougherty, and SRG Coordinator Aldi on multiple occasions, and these requests included several conversations about the specific threats Mr. Thomas received. Pl.'s Statement of Facts ¶¶ 118, 120; Mr. Thomas Dep. at 93:16–94:24, 216:17–21, 221:11–226:10, 233:25–234:25.

Protective custody was available to inmates who were at a substantial risk of serious harm from other inmates in the population where no reasonable alternative was available to protect the inmates' safety concerns. Pl.'s Statement of Facts ¶ 16; Defs.' Statement of Facts ¶ 16. Lieutenant Tammaro was responsible for investigating inmates' requests for protective custody to determine whether the inmate had a verifiable safety concern that warranted granting protective custody. Pl.'s Statement of Facts ¶ 17; Defs.' Statement of Facts ¶ 17. Lieutenant Tammaro would recommend a decision to the Warden or Deputy Warden, and SRG Coordinator

Aldi participated in the decision to grant or deny protective custody to inmates in the Security Risk Group. Pl.'s Statement of Facts ¶ 17.

Lieutenant Tammaro would also occasionally consult Captain Dougherty about protective custody investigations and Captain Dougherty would sometimes participate in interviews. Pl.'s Statement of Facts ¶ 18; Defs.' Statement of Facts ¶ 18. Mr. Thomas directly made a request for protective custody to Captain Dougherty. Pl.'s Statement of Facts ¶ 18; Mr. Thomas Dep. at 87:7–91:25, 100:5–101:23, 122:6–10; Ex. 2 to Opp'n at 16:1–14, 23:25–25:9, ECF No. 68-4 ("Captain Dougherty Dep.").

After Mr. Thomas first requested protective custody in October 2017, he was placed in administrative detention while the request was investigated. Pl.'s Statement of Facts ¶¶ 19–20; Defs.' Statement of Facts ¶¶ 19–20. Lieutenant Tammaro interviewed Mr. Thomas about the request, and Mr. Thomas stated that he was not a Bloods member and that the designation was a mistake based on actions and tattoos that were related to his Jamaican heritage. Pl.'s Statement of Facts ¶ 20; Defs.' Statement of Facts ¶ 20; Mr. Thomas Dep. at 61:7–62:20.

Mr. Thomas also stated that he had previously had an altercation with a high-ranking Bloods member while he was incarcerated at MacDougal Walker, and that he has previously received threats from Security Risk Group Members, including being called a "rat" and told he would be killed. Pl.'s Statement of Facts ¶ 21; Defs.' Statement of Facts ¶ 21. Mr. Thomas stated he started receiving these threats from Security Risk Group Bloods members after they realized he was not a Bloods member. Pl.'s Statement of Facts ¶ 21; Mr. Thomas Dep. at 84:10–86:18. Mr. Thomas also stated that he was previously surrounded by Bloods members during recreation, that he was told he was supposed to report to a Bloods when he was released, and that he

responded that he was not a Bloods member. Pl.'s Statement of Facts ¶ 22; Defs.' Statement of Facts ¶ 22; Mr. Thomas Dep. at 226:18–227:17.

Lieutenant Tammaro investigated Mr. Thomas's claims by reviewing video footage of the time Mr. Thomas stated he was surrounded by Bloods members during recreation. Pl.'s Statement of Facts ¶ 23; Defs.' Statement of Facts ¶ 23. The video showed Mr. Thomas surrounded by Bloods members and Mr. Thomas speaking with two inmates in particular. Pl.'s Statement of Facts ¶ 23; Defs.' Statement of Facts ¶ 23. Immediately after this, Mr. Thomas went to the counselor's office to refuse housing and request protective custody. Pl.'s Statement of Facts ¶ 23; Defs.' Statement of Facts ¶ 23.

As part of the investigation, Lieutenant Tammaro spoke to other inmates and reviewed Mr. Thomas's Facebook page for his recording artist name "Omar Extendo." Pl.'s Statement of Facts ¶¶ 25–26; Defs.' Statement of Facts ¶¶ 25–26. On the Omar Extendo Facebook page, Lieutenant Tammaro found photographs of Mr. Thomas using Bloods hand signs and posts that contained Bloods identifiers and sayings such as "Big Blood Gang." Pl.'s Statement of Facts ¶ 27; Defs.' Statement of Facts ¶ 27; Ex. A to Mot ¶ 18; Ex. 3 to Opp'n at 46:9–13, ECF No. 68-5 ("Lieutenant Tammaro Dep."). Lieutenant Tammaro interpreted these posts to contradict Mr. Thomas's claim that he was not a Bloods member. Pl.'s Statement of Facts ¶ 28; Defs.' Statement of Facts ¶ 28.

Lieutenant Tammaro also received information from another inmate that Mr. Thomas was a Bloods member and that Mr. Thomas wanted protective custody so that he could "get at" another inmate. Defs.' Statement of Facts ¶ 29. Lieutenant Papoosha, who was the administrative intelligence lieutenant at the time, received intelligence that Mr. Thomas was overheard on his

way to court stating that he would get protective custody status so that he could attack two other inmates in protective custody. *Id.* ¶¶ 30–31.

On November 1, 2017, Lieutenant Tammaro recommended that Mr. Thomas not receive protective custody based on the evidence that contradicted Mr. Thomas's statements that he was not a Bloods member, and the safety concern raised by the possibility that Mr. Thomas intended to harm other inmates already in protective custody. Pl.'s Statement of Facts ¶ 34; Defs.' Statement of Facts ¶ 34. The request was reviewed by the Warden's office and the DOC Office of Classification and Population Management, both of whom agreed with the result and denied the request. Defs.' Statement of Facts ¶ 35; Pl.'s Statement of Facts ¶ 35. Mr. Thomas did not receive protective custody but was transferred from E-Pod to B-Pod housing within the Security Risk Group. Defs.' Statement of Facts ¶ 36; Pl.'s Statement of Facts ¶ 36.

Throughout this time, and at all other relevant times, Mr. Thomas continually denied that he was affiliated with the Bloods gang. Pl.'s Statement of Facts ¶ 34; Mr. Thomas Dep. at 60:16–61:24; 220:1–221:10.

On January 19, 2018, Mr. Thomas was confronted by five Bloods members while in the shower. Pl.'s Statement of Facts ¶ 42; Defs.' Statement of Facts ¶ 42. Mr. Thomas and his cell mate, Mr. Marquez, both stated that Mr. Thomas was threatened by the inmates who had approached Mr. Thomas in the shower. Pl.'s Statement of Facts ¶ 41; Defs.' Statement of Facts ¶ 41.

On January 20, 2018, Mr. Thomas attempted to reason with the inmate who threatened him, Mr. Letman, but was unsuccessful. Pl.'s Statement of Facts ¶ 37; Defs.' Statement of Facts ¶ 37. In light of this, Mr. Thomas decided to and then did attack Mr. Letman from behind and

several other inmates immediately joined the fight. Pl.'s Statement of Facts ¶ 37; Defs.'

Statement of Facts ¶ 37; Mr. Thomas Dep. at 108:21–111:23, 233:1–24.

After this incident, the inmates involved were placed in restrictive housing and

interviewed. Pl.'s Statement of Facts ¶¶ 39–40; Defs.' Statement of Facts ¶¶ 39–40. Mr. Thomas

told the interviewer that he should have been provided protective custody, again stated he was

not a Bloods member, and stated he initiated the fight because he did not feel he would be

protected by DOC and did not want to wait to be assaulted. Pl.'s Statement of Facts ¶ 42; Defs.'

Statement of Facts ¶ 42. Mr. Letman stated that the previous night he had told Mr. Thomas to

"cool it" and "that's not how we do things around here," and that is why Mr. Letman believed

Mr. Thomas attacked him. Pl.'s Statement of Facts ¶ 43; Defs.' Statement of Facts ¶ 43.

As part of the investigation, Lieutenant Tammaro reviewed the video footage of January

19, 2019 and saw Mr. Thomas approached by five other inmates while in the shower who then

appeared to have a "heated conversation." Defs.' Statement of Facts ¶ 45; Pl.'s Statement of

Facts ¶ 45. Additionally, during the investigation, a confidential source informed Lieutenant

Tammaro that Mr. Thomas had left the Bloods but was attempting to regain status by being

aggressive and recruiting other inmates to join an unknown Bloods sect. Defs.' Statement of

Facts ¶ 47.

Lieutenant Tammaro credited Mr. Letman's statements and the confidential source rather

than Mr. Thomas's statements and therefore, concluded that Mr. Thomas attempted to meet with

the five Bloods members on January 19, 2018, and Mr. Thomas was insulted by Mr. Letman,

which was the reason he then attacked Mr. Letman the following day. *Id.* ¶ 48.

Mr. Thomas continued to deny he was a Bloods member, and consistently reiterated that

he attacked Mr. Letman as a way to protect himself. Pl.'s Statement of Facts ¶ 48. During the

investigation, Mr. Thomas again requested protective custody, which Lieutenant Tammaro again investigated. Pl.'s Statement of Facts ¶ 49; Defs.' Statement of Facts ¶ 49. Lieutenant Tammaro concluded that there was no evidence, other than Mr. Thomas's and Mr. Marquez's statements that Mr. Thomas had been threatened and therefore, recommended that Mr. Thomas's request for protective custody be denied. Defs.' Statement of Facts ¶ 52; Pl.'s Statement of Facts ¶ 52. The Wardens and Office of Classification and Population Management agreed with the denial. Defs.' Statement of Facts ¶ 53; Pl.'s Statement of Facts ¶ 53.

As a result of the January 20, 2018 attack, Mr. Thomas received a disciplinary report and regressed to the beginning of the Security Risk Group phases, which resulted in Mr. Thomas's transfer to Northern. Pl.'s Statement of Facts ¶¶ 54–55; Defs.' Statement of Facts ¶¶ 54–55.

### b.  The June 11, 2018 Incident

On May 24, 2018, Mr. Thomas was transferred from Northern to MacDougal Walker. Pl.'s Statement of Facts ¶ 62; Defs.' Statement of Facts ¶ 62. At the time, and during his time at Northern, Mr. Thomas requested and was placed on recreational alone status. Defs.' Statement of Facts ¶¶ 62–63; Pl.'s Statement of Facts ¶¶ 62–63; Mr. Thomas Dep. at 126:5–127:6, 130:6–17, 230:7–15, 235:1–10.

While on recreational alone status, Mr. Thomas was generally separated from other inmates, except for those also on recreational alone status. Pl.'s Statement of Facts ¶ 64; Defs.' Statement of Facts ¶ 64.

On June 11, 2018, while the officers in Mr. Thomas's unit were facilitating inmate showers and searching inmate cells, another inmate, Mr. Woolard, attacked Mr. Thomas after Mr. Thomas's cell door was opened. Defs.' Statement of Facts ¶¶ 88–99; Pl.'s Statement of Facts ¶¶ 88–99, 137–142; Mr. Thomas Dep. at 139:14–140:5, 242:3–243:6.

Mr. Woolard walked past Mr. Thomas's cell door on his way to the showers and threatened to assault Mr. Thomas. Pl.'s Statement of Facts ¶ 137; Mr. Thomas Dep. at 239:14–240:13; Defs.' Statement of Facts ¶ 63. Correctional Officer Hall, who was posted near the control room, also heard Mr. Woolard arguing with Mr. Thomas on his way to the showers. Pl.'s Statement of Facts ¶ 138; Ex. 4 to Opp'n at 58:15–59:25, ECF No. 68-6 (Aug. 1, 2022) ("Correctional Officer Hall Dep."). Mr. Woolard was accompanied by Correctional Officer Riddle while he showered and Correctional Officer Laughman was in Mr. Woolard's cell 84 conducting a search. Defs.' Statement of Facts ¶¶ 84, 88; Pl.'s Statement of Facts ¶¶ 84, 88.

Mr. Woolard returned from the shower without a Correctional Officer walking with him and yelled out several times to open cell 90, where Mr. Thomas was assigned. Pl.'s Statement of Facts ¶ 139; Defs. Statement of Facts ¶ 91; Mr. Thomas Dep. at 139:1–15, 242:3–7. Correctional Officers Riddle and Laughman both responded to Mr. Woolard by yelling for him to stop calling for cell 90 because that was not his cell. Defs.' Statement of Facts ¶ 92; Pl.'s Statement of Facts ¶ 92.

Correctional Officer Barbuto, who was working the control room, stated that he saw Mr. Woolard slow ahead of cell 90 and heard cell 90 called several times. Pl.'s Statement of Facts ¶ 93; Defs.' Statement of Facts ¶ 93.[1] Correctional Officer Barbuto opened cell 90[2] and Mr. Woolard ran into Mr. Thomas's cell. Defs.' Statement of Facts ¶¶ 93–94; Pl.'s Statement of Facts ¶¶ 93–94. Mr. Woolard punched Mr. Thomas in the face, head, and body, knocking Mr. Thomas into the sink and toilet. Pl.'s Statement of Facts ¶ 140. Correctional Officer Laughman

---

[1] The Court notes that the parties contest what exactly Correctional Officer Barbuto heard and saw before opening cell 90.

[2] Typically, Correctional Officer Barbuto should wait for an officer to call out a cell door number a few times, which he would hear through a speaker system in the control room, before opening the cell door. Defs.' Statement of Facts ¶ 81; Pl.'s Statement of Facts ¶ 81. An officer should also typically be within the inmate's vicinity when calling out for the cell door to be opened. Defs.' Statement of Facts ¶ 82; Pl.'s Statement ¶ 82.

ran into the cell and grabbed Mr. Thomas, pushing him to the back of the cell. Pl.'s Statement of facts ¶ 141. Correctional Officer Riddle then grabbed Mr. Woolard. Defs.' Statement of Facts ¶ 98; Pl.'s Statement of Facts ¶ 98. Correctional Officer Hall came to assist Correctional Officer Riddle, and then briefly entered Mr. Thomas's cell, before returning to Correctional Officer Riddle and Mr. Woolard. Pl.'s Statement of Facts ¶ 100; Defs.' Statement of Facts ¶ 100.

Mr. Thomas was compliant with Correctional Officer Laughman when he entered cell 90. Pl.'s Statement of Facts ¶ 144; Mr. Thomas Dep. at 246:2–7. Correctional Officer Laughman held Mr. Thomas's hands behind his back and told him the assault was over. Pl.'s Statement of Facts ¶ 143. When Correctional Officer Hall entered Mr. Thomas's cell, Mr. Thomas's face was shoved into the window bars at the back of the cell. *Id.* ¶ 145; Mr. Thomas Dep. at 140:6–143:25.

As a result of this incident, Mr. Thomas had swollen lips and face, lacerations to his face, a bleeding mouth, scratched and bruised back, and bruised ribs and elbows. Pl.'s Statement of Facts ¶ 146. Mr. Thomas has suffered ongoing headaches and migraines, vision impairment, severe emotional distress, and increased blood pressure. *Id.*

### B. Procedural History

On August 13, 2018, Mr. Thomas, proceeding *pro se*, filed a Complaint against SRG Coordinator Aldi, Lieutenant Chevalier, Captain Dougherty, Lieutenant Tammaro, and Lieutenant Papoosha. *See* Compl., ECF No. 1.

On October 2, 2018, the Court issued an Initial Review Order directing Mr. Thomas to file an Amended Complaint within thirty days and ordering the Clerk of Court to amend the case caption to include Lieutenant Davis, Correctional Officer Barbuto, Correctional Officer

Laughman, Correct Officer Hall, Captain Walsh, and Population Management. *See* Initial Review Order, ECF No. 8.

On October 12, 2018, Mr. Thomas filed two motions to amend the Complaint. *See* Mot. to Amend, ECF No. 9; Mot. to Amend, ECF No. 10.

On November 14, 2018, Mr. Thomas filed a motion for default entry under Rule 55(a), *see* Mot. for Default, ECF No. 11, which this Court denied as premature on November 20, 2018, *see* Order, ECF No. 12.

On November 26, 2018, Mr. Thomas filed a motion for summary judgment, *see* Mot. Summ. J., ECF No. 14, and on January 16, 2019, Mr. Thomas filed a motion for judgment, *see* Mot. for J., ECF No. 14.

On January 18, 2019, the Court denied both motions because "no Amended Complaint has been authorized by the Court to be served on Defendants." *See* Order, ECF No. 16.

On January 18, 2019, the Court issued an Order denying Mr. Thomas's motions to amend the Complaint and again directed Mr. Thomas to file an Amended Complaint that includes "only the eleven existing defendants in the case captions," as well as a statement of facts, a statement of legal claims, and a request for relief by March 1, 2019. *See* Order, ECF No. 15.

On January 25, 2019, Mr. Thomas filed an Amended Complaint. *See* Am. Compl.

On September 3, 2019, Mr. Thomas again filed a motion for summary judgment, *see* Mot. for Summ. J., ECF No. 22, and on October 11, 2019, Mr. Thomas filed a motion for default entry under Rule 55(a), *see* Mot. for Default, ECF No. 24.

On October 17, 2019, the Court denied the motion for default entry because Defendants had not yet been served. *See* Order, ECF No. 25. On January 24, 2020, the Court denied Mr.

Thomas's motion for summary judgment without prejudice as premature. *See* Order, ECF No. 26.

On March 9, 2020, the Court issued an Initial Review Order of the Amended Complaint, allowing the deliberate indifference/failure to protect claims against Captain Dougherty, Lieutenant Tammaro, and Correctional Officers Laughman, Hall, and Barbuto, and the excessive force claim against Correctional Officer Laughman to go forward. *See* IRO at 1–2.

On October 28, 2020, Defendants filed a motion for extension of time to respond to the Amended Complaint, *see* Mot. for Extension of Time, ECF No. 37, and the Court granted the motion and issued deadlines for discovery and dispositive motions, *see* Order, ECF No. 38.

On June 4, 2021, counsel entered his appearance on behalf of Mr. Thomas. *See* Notice, ECF No. 44.

On May 20, 2022, Defendants filed their motion for summary judgment and supporting documents. *See* Mot.

On August 1, 2022, Mr. Thomas filed his response to the motion for summary judgment. *See* Obj. to Mot. for Summ. J., ECF No. 68 ("Opp'n").

On September 6, 2022, Defendants filed their reply in support of the motion for summary judgment. *See* Reply to Resp. to Mot. for Summ. J., ECF No. 71 ("Reply").

On September 16, 2022, Mr. Thomas filed a motion for a hearing on the pending motion for summary judgment, *see* Mot. for Hearing, ECF No. 72, which the Court granted, *see* Order, ECF No. 71.

On November 1, 2022, the Court held a motion hearing at which the parties made arguments about the pending motion for summary judgment. *See* Min. Entry, ECF No. 75.

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated

speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

The Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), regardless of whether the inmate may obtain the specific relief he desires through the administrative process, *Booth v. Churner*, 532 U.S. 731, 738 (2001). Failure to exhaust administrative remedies under 42 U.S.C. § 1997e(a) is an affirmative

defense. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, defendants have the burden of proving that a plaintiff has not exhausted claims before filing in court. *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

The PLRA requires "proper exhaustion," which includes complying with all "procedural rules," including filing deadlines, as defined by the particular prison grievance system. *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). In other words, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (citing *Woodford*, 548 U.S. at 83–84). The exhaustion requirement, however, may be excused when the remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 578 U.S. 632, 643 (2016). Thus, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth*, 532 U.S. at 738). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs*, 788 F.3d at 59.

Administrative Directive 9.6 ("A.D. 9.6") governs grievances inmates may have for any "issue[s] relating to any aspect of an inmate's confinement" at Garner. Administrative Directive 9.6 at 1, ECF No. 54-19 ("A.D. 9.6"). A.D. 9.6(6) requires an aggrieved inmate to attempt informal resolution prior to filing a grievance. *Id.* at 5. To seek informal resolution, "the inmate shall submit a written request via CN 9601, Inmate Request Form." *Id.* Once submitted, "[a] response . . . shall be made within 15 business days from receipt of the written request." *Id.*

A.D. 9.6(6)(C) provides that the Level 1 Grievance must be filed within thirty calendar days from the date of "the occurrence or discovery of the cause of the grievance" and should

include a copy of the response to the written CN 9601 request to resolve the matter informally or explain why the CN 9601 response is not attached. *Id.* at 6. The Unit Administrator is required to respond in writing to the Level 1 grievance within thirty business days of receipt of the grievance. *See id.* at 7. If an inmate does not receive a response to a Level 1 grievance within 30 business days, they may appeal to Level 2. *Id.*

A Level 2 grievance may be filed within five business days of receipt of the Level 1 decision. *Id.* The Level 2 decision must be made "in writing within 30 business days of receipt . . . and shall include a statement of the remedy" or the reason for denial. *Id.* An inmate may appeal certain Level 2 dispositions to Level 3, so long as the appeal is made within five days of receipt of the Level 2 disposition. *Id.* An inmate may appeal to Level 3 to "challenge[] Department level policy"; "challenge[] the integrity of the grievance procedure; or" appeal a grievance that "[e]xceeds the established 30 business day time limit for a Level 2 grievance response." *Id.* An inmate who wishes to submit a Level 3 appeal based on the lack of response to a Level 2 appeal, must do so within 35 days of filing the Level 2 appeal. *Id.* at 8. The Level 3 review shall be completed, and a response given in writing, within 30 business days of receipt. *Id.* at 7.

Inmates must submit grievances or appeals of the disposition of a prior grievance "by depositing them in a locked box clearly marked as 'Administrative Remedies.'" *Id.* at 3. These lock boxes are available in the DOC facilities. *Id.*

On the issue of exhaustion, Mr. Thomas makes essentially three arguments.

First, he argues that his use of informal procedures constituted exhaustion. Opp'n at 9–10. More specifically, for his deliberate indifference claim related to the failure to grant him protective custody, Mr. Thomas states that he informally resolved the issue after filing a Level 1 grievance because he was granted recreational alone status, which is essentially the remedy he

16

sought. *Id.* at 12–14. Similarly, for his deliberate indifference claim related to Mr. Woolard's attack, Mr. Thomas states that he informally resolved the issue after filing a Level 1 grievance because he spoke to Correctional Officer Barbuto, who had opened his cell door allowing the attack to occur, and Correctional Officer Barbuto apologized. *Id.* Mr. Thomas relies in large part on *Gibson v. Brooks*, 335 F. Supp. 2d 325, 331–32 (D. Conn. 2004), and *Ortiz v. McBride*, 380 F.3d 649, 652–53 (2d Cir. 2004), which Mr. Thomas argues support the argument that, if he received a favorable outcome at one level of the grievance procedure, Mr. Thomas did not need to appeal to higher levels in order to meet the exhaustion requirement. Opp'n at 9–10.

Next, even if he did not exhaust his remedies, Mr. Thomas argues that he presented sufficient evidence to establish a genuine issue of material fact as to whether the administrative procedures were not available to him because they operated as a dead end. Opp'n at 17. Mr. Thomas stated that he requested protective custody several times, was denied each time, and recalled filing an appeal within the protective custody procedures. *Id.* at 17–18. Additionally, Mr. Thomas stated that he filed Level 1 grievances related to his deliberate indifference claims. *Id.* Mr. Thomas argues that there was a "routine cycle" of DOC officers returning grievances for technical mistakes or never submitting the grievances at all. *Id.* at 18.

Finally, Mr. Thomas argues that he presented sufficient evidence to establish a genuine issue of material fact as to whether the administrative procedures were opaque in terms of the response Mr. Thomas received to his June 2018 grievance. Opp'n at 17. Mr. Thomas argues the response, which stated his grievance was returned without disposition to be resubmitted with additional information, was opaque and a dead end because Mr. Thomas had provided all the information he had. *Id.* at 19.

As to Mr. Thomas's first argument, Defendants argue that Mr. Thomas fails to address "well-established precedent that an inmate must fully exhaust correctional administrative remedy procedures, even when seeking relief that the correctional organization could not provide." Reply at 2. Additionally, Defendants emphasize that the relief sought is immaterial and the only relevant question is whether the procedures were available. *Id.* 2–3. Defendants also argue that *Gibson v. Brooks* and *Ortiz v. McBride* do not address Mr. Thomas's situation because in those cases, the plaintiffs received a favorable determination within the established procedures, whereas here, Mr. Thomas pursued relief through alternative means. *Id.* at 5–6.

As to his second argument, Defendants argue that the fact that Mr. Thomas may not have received responses to informal requests or Level 1 grievances does not constitute a dead end because A.D. 9.6 directs inmates who have not received a timely response to appeal to the next level. Reply at 3–4. Defendants also argue that Mr. Thomas's grievances were rejected based on "clearly delineated requirements" in A.D. 9.6. *Id.*

Finally, as to Mr. Thomas's third argument, Defendants argue that the Second Circuit has previously held that A.D. 9.6 is not opaque, *see Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016), and the language in the response to Mr. Thomas's Level 1 grievance does not "demonstrate[] any opaque or otherwise vague requirement[s] that a reasonable inmate could not follow." Reply at 4. Defendants also argue that Mr. Thomas's grievance was rejected based on "clearly delineated requirements" in A.D. 9.6. *Id.*

The Court agrees with Defendants.

In *Gibson v. Brooks*, the court denied a motion for summary judgment where the plaintiff had exhausted his administrative remedies despite not filing a formal Level 1 grievance because the plaintiff had complained informally to an officer. 335 F. Supp. 2d at 331. Specifically, the

plaintiff complained to an officer, as the first step within the DOC grievance procedure, and the court found the plaintiff "created a genuine issue of material fact" as to whether he pursued that informal resolution and received a favorable ruling. *Id.* at 333. The court noted that the plaintiff complained to the officer who failed to protect him, and the officer acknowledged wrongdoing. *Id.*

Similarly, in *Ortiz*, the plaintiff received a favorable determination on one of his claims at an intermediate stage of the prison grievance system, and, therefore, the court found that this claim was exhausted. 380 F.3d at 652–53. The court also found the plaintiff did not exhaust a separate claim where the plaintiff informally complained to an officer because the informal complaint was "to no avail" and the plaintiff did not get the relief he requested. *Id.* at 654.

While *Gibson* and *Ortiz* appear to support Mr. Thomas's argument that because he received a favorable outcome through informal channels, he did not need to appeal to exhaust his claims, the Second Circuit has since clarified the exhaustion doctrine.[3] More specifically, "an

---

[3] Mr. Thomas's arguments are also distinguishable from *Gibson* and *Ortiz* because the plaintiffs in those cases operated within the established prison grievance procedures to achieve the outcome they specifically requested, *see Gibson*, 335 F. Supp. 2d at 331–32 (requesting and receiving an apology); *Ortiz*, 380 F.3d at 652–53 (granting the plaintiff's request that an administrative decision be overturned), whereas here, Mr. Thomas decided not to pursue the A.D. 9.6 procedures after receiving his Level 1 grievances returned without disposition, *see* Pl.'s Statement of Facts ¶¶ 113, 116; Defs.' Statement of Facts ¶ 114; Mr. Thomas Dep. at 209:11–14 ("Q: So not asking about generalities here or assumptions, do you recall specifically filing something else [about the June 11 incident] other than [the Level 1 grievance]? A: I don't recall."). Mr. Thomas instead requested recreational alone status, a different form of relief, through alternative channels. *See* Pl.'s Statement of Facts ¶¶ 147–148. Additionally, even if Mr. Thomas had remained within the A.D. 9.6 procedures, he did not receive the relief he requested in each of his Level 1 grievances. In the first, he requested to be placed on protective custody status. *See* Attach. 1 to Ex. H to Mot. at 004, ECF No. 54-11 (May 20, 2022) ("CRCC Grievances"). Instead, Mr. Thomas was ultimately only placed on recreational alone status, which, typically involves being in a cell alone and only being outside of the cell with inmates who were also on recreational alone. *See* Pl.'s Statement of Facts ¶ 135. In Mr. Thomas's case, however, on recreational alone status he was sometimes assigned a cell with another inmate, he was still concerned about recreational time with other inmates, particularly the other Bloods members who were on recreational alone status, and Mr. Thomas still received threats that made him fearful despite his recreational alone status. *See* Mr. Thomas Dep. at 226:11–17, 238:12–16, 239:2–12. Additionally, in the second grievance, Mr. Thomas requested that the staff be trained to better protect inmate safety. *See* Attach. 1 to Ex. I to Mot. at 002, ECF No. 54-12 (May 20, 2022) ("MWCI Grievances"). Instead of pursuing that relief, Mr. Thomas spoke with Correctional Officer Barbuto, who apologized to him. *See* Pl.'s Statement of Facts ¶ 151; Mr. Thomas Dep. at 194:6–196:16. Not only does the apology not address the relief he requested, additional training, but it also does not address the alleged roles of the other correctional officers involved.

inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016). This requirement, notably, relates not to the available remedy, but to the available administrative procedure. *Id.*; *see also Rucker v. Giffen*, 997 F.3d 88, 92–93 (2d Cir. 2021) (noting that *Ross* stated that "prisoners are exempt from the exhaustion requirement only when the grievance procedures are not 'capable of use to obtain some relief for the action complained of' such that the administrative remedies are 'unavailable'" in the three circumstances identified by the Supreme Court (quoting *Ross*, 578 U.S. at 641–42)).

Even where the plaintiff receives some remedy outside of the administrative grievance procedures, the plaintiff is still required to exhaust the administrative procedures unless the procedures are unavailable. *See Ruggiero*, 467 F.3d at 178 ("While [the plaintiff] may not have been interested in the results that pursuing his claim [administratively] would have yielded, the larger interests at stake under the PLRA" such as "allow[ing] the prison to take corrective action, which may satisfy the prisoner and obviate the need for litigation; . . . result in improvements to prison administration; and, . . . facilitate adjudication by ensuring a fully-developed administrative record that 'clarifies the contours of the controversy,'" were at issue).

More specifically, in *Ruggiero*, the plaintiff was not excused from exhausting the administrative remedies where he informally reported mistreatment and was transferred to another facility, which was the remedy requested in his complaint, because "the standard . . . is not whether the prisoner has a *reason* to pursue administrative remedies; it is whether such remedies are *available* to him." *Id.* at 176.

Courts have consistently applied this reasoning to circumstances similar to those present here. *See Scott v. Greene*, No. 3:20-cv-1904 (SALM), 2022 WL 903293, at *8–9 (D. Conn. Mar.

28, 2022) ("[P]laintiff's assertion that she was not required to exhaust her administrative remedies because she would not have been able to obtain through the ARP the relief she now seeks lacks merit."); *Hartry v. County of Suffolk*, 755 F. Supp. 2d 422, 431–32 (E.D.N.Y. 2010) (finding plaintiff was required to exhaust administrative remedies even where he had already been transferred to a different facility, which was the relief he sought); *Miller v. Annucci*, No. 17-CV-4698 (KMK), 2021 WL 4392305, at *13–14 (S.D.N.Y. Sept. 24, 2021) (finding the plaintiff failed to exhaust administrative remedies despite the plaintiff's claim that there was no relief which could have been obtained through the facility grievance process and that he informally received a favorable decision negating the need for formal administrative remedies because the "Second Circuit has no rule 'that a prisoner has exhausted his administrative remedies every time he receives his desired relief through informal channels'" (quoting *Ruggiero*, 467 F.3d at 177–78)).

Therefore, Mr. Thomas had to show that the administrative procedures were not available to him.

The Supreme Court has established three circumstances under which an inmate need not exhaust the administrative procedure because it is unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–644.

"To constitute an 'available' remedy, a process requires only 'the *possibility* of some relief.'" *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State*

*Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021) (quoting *Ross*, 578 U.S. at 643). "An administrative procedure is unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.'" *Romano v. Ulrich*, 49 F.4th 148, 155 (2d Cir. 2022) (quoting *Ross*, 578 U.S. at 643). "In *Ross*, the Supreme Court provided the example of a prison handbook that directs inmates to submit their grievances to a particular administrative office that then disclaims the capacity to consider those petitions" such that the procedure was not "capable of use" for its purpose. *Id.* (citing *Ross*, 578 U.S. at 643). The failure to respond to a grievance does "not render the . . . administrative procedure unavailable" as long as the administrative guidance "sets forth the procedure to follow" in such circumstances. *Taylor v. N.Y.C. Dep't of Corr.*, 849 F. App'x 5, 8 (2d Cir. 2021).

Here, Mr. Thomas stated broadly that some grievances "disappeared or the officer said . . . ['] I got them,[']" but then he would "[n]ever see them again" and they "never had a signature" or were "never returned." Mr. Thomas Dep. at 207:19–22. Mr. Thomas further stated that "the [grievances] that do get returned . . . come back with an attachment that say[s] . . . what they are going to do about it if they can do something about it." *Id.* at 207:23–208:2. Additionally, Mr. Thomas stated that "[s]ometimes the requests don't go through" because the officer "would just bring you the request without his signature . . . and tell you . . . however he's gonna deal with it" and that "[s]ome of the requests definitely did not get submitted." *Id.* at 208:19–209:5. Mr. Thomas stated the officers "would give [him] the runaround." *Id.* at 207:17–18.

Mr. Thomas, however, undisputedly submitted a Level 1 grievance related to each of the underlying incidents and received a response to each. *See* Pl.'s Statement of Facts ¶¶ 110–113, 115–116. In Mr. Thomas's March 2018 grievance, he described the incident but did not include any information related to an attempt to informally resolve the issue as is required by A.D. 9.6.

22

*See* CRCC Grievances at 004; A.D. 9.6 at 5–6. Mr. Thomas's March 2018 grievance was returned without disposition and instructed him to "attempt written informal resolution" before re-submitting the Level 1 grievance. CRCC Grievances at 005. There is no record of Mr. Thomas re-filing or appealing this Level 1 grievance.

In Mr. Thomas's June 2018 grievance, he noted that he "wrote to [the] Captain of [his] unit" and did not receive a response. MWCI Grievances at 002. The June 2018 grievance described the incident, requested the incident report, and requested that staff be trained on inmate safety. *Id.* This grievance was returned without disposition, and he was directed to file each request for a remedy on a separate form. *Id.* at 003. Additionally, Mr. Thomas was instructed that his request for an incident report should be pursued through a different procedure and that "more information" was needed concerning his request that staff "be more vigilant to inmate safety." *Id.* There is no record of Mr. Thomas filing an appeal or re-filing this grievance.

An administrative grievance scheme can be so opaque that it is unavailable if the relevant sections do not provide a clear answer regarding how to pursue a particular administrative remedy. *See Williams v. Priatno*, 829 F.3d 118, 124–26 (2d Cir. 2016) (holding that the administrative procedures were "prohibitively opaque" in part because the procedures "d[id] not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response"); *see also Sease v. Frenis*, No. 3:17-cv-770 (SRU), 2021 WL 260398, at *9 (D. Conn. Jan. 25, 2021) ("If the absence of guidance in a grievance procedure can lead to an administrative scheme's being 'prohibitively opaque,' then surely contradictory instructions in a grievance procedure can also lead to an administrative scheme's being prohibitively opaque." (quoting *Priatno*, 829 F.3d at 124–27)).

Here, in response to the June 2018 grievance, Mr. Thomas received instructions to provide additional information. MWCI Grievances at 003 ("You are discussing staff to be more vigilant to inmate safety, you need [to] provide more information to investigate this incident more clearly."). Mr. Thomas also received instructions to submit each request for an administrative remedy on a separate form. *Id.* at 002. On the original grievance, Mr. Thomas had provided his name, inmate number, the date of the incident, a specific time frame, and a description of the assault. *Id.* It is not clear what, if any, additional information Mr. Thomas could have provided that the DOC did not already know or have access to. But this is insufficient to show the procedures operated as a dead end because, despite this seemingly opaque response, Mr. Thomas was still given the opportunity to re-file his original grievance on a separate form, as requested, or appeal the returned without disposition outcome, and he did not do either. *Cf. Priatno*, 829 F.3d at 126 (recognizing opaqueness where there is no "guidance on how a transferred inmate can appeal his grievance"); *see also Green Haven*, 16 F.4th at 82 ("To constitute an 'available' remedy, a process requires only 'the *possibility* of some relief.'" (quoting *Ross*, 578 U.S. at 643)).

Moreover, while Mr. Thomas generally described getting "the run around" with respect to grievances, he has not provided any evidence that this actually occurred with respect to the two grievances at issue here. In fact, when specifically asked if he appealed or re-filed the June 2018 grievance, Mr. Thomas stated that he did not remember or that he did not re-file or appeal the grievance. Mr. Thomas Dep. at 208:3–6 ("Q: Did you file another CN 9602 grievance form related to June 11th? A: I don't remember. I'm not saying yes or no. If it's documented, then I guess I filed one."), 209:11–14 ("Q: So not asking about generalities here or assumptions, do you

24

recall specifically filing something else other than this [Level 1 grievance related to the June 11, 2018 incident]? A: I don't recall.").

Therefore, because he received responses to his Level 1 grievances consistent with the requirements of A.D. 9.6 and did not re-file or appeal those responses, there is no evidence in this record from which a jury could infer that this process was a dead end. *See Grafton v. Hesse*, 783 F. App'x 29, 31 (2d Cir. 2019) (finding no dead end where plaintiff "has not provided any evidence regarding the outcome of his past grievances" and the evidence that "several of his past grievances contain[ed] the notation 'Grievance Accepted' . . . undermines his argument that prison staff had made the prison grievance system a dead end by not collecting and processing grievances as required"); *Antrobus v. Warden of GRVC*, No. 11 Civ. 5128, 2012 WL 1900542, at *3 (S.D.N.Y. May 25, 2012) (finding the administrative procedure was not operating as a dead end where the plaintiff generally stated that "others who noticed the same problems and grieved had been given 'the run around'" because the plaintiff did not take any steps to appeal his initial grievances).

Accordingly, there is no genuine issue of material fact as to whether Mr. Thomas exhausted his administrative remedies—he did not—or can be excused from having failed to exhaust them; again, as a matter of law, he cannot.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED.**

The Clerk of Court is respectfully directed to close this case.

SO ORDERED at Bridgeport, Connecticut, this 4th day of November, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE
